## INGE v. MURPHY.

1. When a husband has possession of slaves after his marriage, which previously belonged to his wife's father, and subsequently accepts from him a deed conveying them to the issue of the wife, after her death, his acts and declarations, showing his only title was under this deed, will conclude his assignee from asserting a title independent of it.

2. A deed executed in North Carolina, conveying slaves to a person resident there, must be construed by the laws of that State, and if the common law has been there modified by local decisions, those furnish the rule, and not the common law as understood in our courts.

3. The modifications of the common law of a sister State, by its judicial decisions, may be proved by the production of the reports of adjudged cases, accredited in the particular State.

4. The construction of foreign laws, whether they are proved to the court or

to the jury, is the proper province of the court, and it is error if the construction is left to the jury.

5. The presumption is, the common law prevails in those States of common origin with our own, and it rests with the party asserting a change or modification to show it. To show such a change or modification, the decisions of their courts must be looked to, as we look to our own, in the event witnesses are examined who rest their opinions on decided cases, and notwithstanding disagree as to the conclusions to be drawn.

6. The silence of a remainder man, after learning of a conveyance in trust for creditors, by the person having a previous estate, is no estoppel to the assertion of his title.

7. The circumstance that the remainder man is a beneficiary under the deed of trust, and receives monies arising from the sales of other property conveyed by the deed, is not a matter to affect the title; nor proper to be left to the jury to infer an abandonment of his right.

8. Where the question arising out of the possession of property for three years, under an unrecorded deed, is not raised before the jury, it will not be pronounced on in this court.

Writ of Error to the Circuit Court of Greene.

DETINUE, by Murphy against Inge, for a number of slaves.

At the trial, the following state of facts was agreed by the parties, and submitted as evidence to the jury, to wit: Dr. Richard Inge married Miss Eliza Bullock, in Granville county, North Carolina, in the year 1813. At that time Dr. Inge resided at Louisburg, in Franklin county, North Carolina, about thirty-five miles from the residence of his wife's father. After the marriage, his father-in-law, Mr. Bullook, placed in Dr. Inge's possession, among other slaves those now in controversy, or their ancestors, and the possession was retained by Dr. Inge. Dr. Inge had one child born of this marriage, who is the defendant to this suit. After the birth of the child, in the year 1816, his mother died, and after her death, on the 30th November, 1919, Wm. Bullock, the father-in-law of Dr. Inge, made a deed of gift, by the consent of Dr. Inge, of the slaves in controversy, or their ancestors. This deed of gift was recorded in the office of the clerk of registration, in Granville county, North Carolina, a copy of which is produced, and is to the effect following, to wit: William

Bullock to Dr. Richard Inge. Know·all men by these presents, that I, William Bullock, of the county of Granville, and State of North Carolina, for divers good causes and considerations me hereunto moving, but more especially for the love and affection which I bear unto my son-in-law, Richard Inge, and my grandson, Wm. E. B. Inge, have given, granted and conveyed unto the said Richard Inge, the following slaves: [here is inserted their names,] to have and to hold unto him, the said Richard Inge, for and during the term of his natural life, and after his death to my grandson, Wm. E. B. Inge and his heirs forever.

This was executed under the hand and seal of Bullock, on the 30th of November, 1819, in the presence of two witnesses.

After the making and delivery of this deed, to wit, in the year 1819, Dr. Inge removed himself, the slaves, and Wm. B. Inge, his son, to the State of·Alabama. No record was ever made of the deed of gift in this State. On the 8th February, 1837, Dr. Inge gave his son 28 or 30 slaves, (all of this stock except two,) which his son took off with him, leaving the slaves in controversy in the possession of his father, and they remained in his possession until his death.· W. B. Inge was born the 22d June 1815. In March, 1841, Dr. Inge made a deed of trust to Thomas H. Herndon and Wm. M. Murphy, as trustees, without the knowledge of W. B. Inge, which deed was read without objection, and is the same under which the plaintiff makes title. W. B. Inge is one of the beneficiaries under this deed. After the death of Dr. Inge, on the 28th July, 1841, all the slaves named in the trust deed went into possession of Herndon and Murphy, as trustees, and on the 23d January, 1842, W. B. Inge, without the knowledge or consent of the trustees, took the slaves from their possession, and had the same in possession at the time of suit, and at the time of the trial. After W. B. Inge took the slaves, he participated as a beneficiary in the deed of trust, so far as appropriations were made from said trust, in proportional payment of certain debts therein specified, for which he was liable as the surety of Dr. Inge. About 1828, Dr. Inge sold a negro woman, and two children, of the stock mentioned in the deed of gift. At the time W. B. Inge, in the lifetime of his father,

took the slaves in that behalf mentioned, a negro slave Nazareth was left, at the request of Dr. Inge, who was then engaged in building, and had the slave employed as a sawyer.

The deed of trust is appended to the record, and was executed to secure the payment of certain debts therein enumerated, and to indemnify certain persons, his sureties, and vests the title of the slaves, and other matters conveyed, in the trustees before named, for the purposes of the trust. Wm. Bullock's last will and testament was read to the jury, without objection, and contains this clause : " I give unto my grand-son, W. B. Inge, fourteen slaves ; to his mother, Elizabeth Inge, with all the stock and household furniture, put in her possession at her marriage with Dr. Inge, the negro property I have heretofore made my grandson Wm. B. Inge a deed of gift which is in full of the legacy to my said daughter Elizabeth." This will was published 29th August, 1829.

The defendant also offered in evidence, from a letter wrote to him by his father, dated Richland, April 23d, 1836, and directed to him at Mobile, the following sentence : " There is another subject which I feel it my duty to name ; there is a property here sacredly your's, and which you will assuredly get."

He also proved that when he received the other slaves in February, 1837, Dr. Inge stated as the reason why Nazareth, Tabby, Eliza and the other slaves, who were children of the two latter, did not then go into the possession of his son, was as before stated, with respect to Nazareth, and as to the other two named, that they had husbands on Dr. Inge's plantation. Tabby was old, Eliza sickly, and the others children, and they would be of no use to one commencing in the woods ; also that the slaves here sued for, as well as those then taken off belonged to the defendant.

The plaintiff then read in evidence from the Revised Statutes of North-Carolina the following sections of an act passed at the session of the legislature for the year 1836-7, to-wit : " No gift hereafter to be made of any slave shall be good or available, either at law or equity, unless the same shall be made in writing, signed by the donor, and attested by at least one credible witness subscribing ; neither shall such gift be

Inge v. Murphy.

valid unless the writing by which the title by which any slave is transferred, shall be proved or acknowledged, as conveyances of land, and registered in the office of the public register of the county where the donee resides, within one year after the execution thereof, if the donee be in the actual possession of the slave so given and transferred; but, if under any special agreement made at the time of the gift, the donee shall remain in the possession of the slave so given, then the writing transferring or conveying the same slave shall be proved or acknowledged as aforesaid, and registered within the same time in the county where the donor resides : *Provided,* that when any person shall have put into the actual possession of his or her child or children, any slave, and the said slave shall remain in the possession of such child or children at the time of the death of such person, he or she dying intestate, such slave shall be considered as an advancement to such child or children, and be regulated by the laws now in force relating to advancements made to children by a parent in his life time."

" Every limitation by deed or writing of a slave or slaves, which limitation, if contained in a last will and testament, would be good and effectual as an executory devise or bequest, shall be and is hereby declared to be a good and effectual limitation in remainder of such slave or slaves ; and any limitation made or reserved to the grantor, vendor or donor, or any such deed or writing of a slave or slaves, shall be good and effectual in law : *Provided* such limitation, had it been made to another person, would be good and effectual according to the preceding clause: *Provided also,* that all such deeds or writing shall be proved, witnessed, and registered as other written conveyances of slaves are or may be by law required to be witnessed, proved and registered."

The plaintiff then offered to read to the jury as evidence of what was and is the law of North-Carolina, from 2d vol. Haywood's Reports, the case of Catlin and Hay v. Spiller's administrators, reported at page 130, and the case of Gilbert v. Murdock, reported at page 182, and from 2 Devereux' L. Reports, the case of Sutton v. Hallowell, reported at page 185, and the case of Morrow v. Williams, reported at page

112

263 of the 3d vol. of the same Reports. To the reading of which as evidence the defendant objected. The court overruled the objection.

This was the entire evidence offered on behalf of the plaintiff.

The court, in the course of its charge to the jury stated, that by the general law a remainder in chattels, after a life estate, could be conveyed by deed, and would be valid and effectual ; but if the jury should find as a fact that by the law of North-Carolina, in force at the time when the deed of gift was made, that such remainder over was void, and that the first taker took an absolute estate, then they should find for the plaintiff without regard to what the general or common law of the other States of the Union might be ; and to enable them to ascertain what the law of North-Carolina was, they might look to the statutes and books of reports read to them.

The defendant asked the court to instruct the jury, that if the defendant, on learning that Dr. Inge had made a deed of trust, remained passive, neither assenting or dissenting therefrom, that his participating as a beneficiary under the deed, as stated in the evidence agreed on, would be no estoppel to his setting up his title under the deed of gift, whereupon the court charged that such passiveness would not be an absolute estoppel, but it would be a circumstance from which they could draw their own conclusions, and determine whether the defendant had waived or abandoned his property in the slaves.

The plaintiff asked the court to charge the jury, that the participation of the defendant as a beneficiary under the deed of trust, as stated in the facts agreed, did estop him from claiming the slaves under the deed of gift. This the court refused, but charged the jury that it was a circumstance which they could take into their consideration with all the other circumstances of the case, in determining whether the defendant knew of the conveyance ; and if he knew it, then of determining whether he had assented to such disposition of the property by his father, or subsequently ratified it. If he assented to it, or ratified it, he would be estopped.

After the jury had retired, they returned for further in-

Inge v. Murphy.

structions, and they were then charged, that if the proof justified it, they might regard and consider of any knowledge they might believe the defendant had before the making of the trust deed, that it was going to be made—his silence afterwards—whether when informed of it, he objected to the conveyance of the slaves—the receipt by him of the other slaves, when he left his father, in 1837, the slaves in controversy remaining still with Dr. Inge—the near residence of the defendant to Dr. Inge, his father, being only three or four miles off—and the subsequent participation, after he took those negroes off, in the proceeds of the other trust effects, by receiving them in payment of debts secured to him—all as circumstances in determining whether the defendant had abandoned his property, or assented to the said disposition of the slaves by his father; and if, from these circumstances, the jury should find, either that the defendant knew of the proposed disposition of the property, and did not dissent from it; or afterwards assented to such disposition of said property, with a knowledge that it had been thus conveyed by Dr. Inge, then he was estopped from ever after setting up his title to said property.

The defendant excepted to the several charges given by the court, as well as to the several matters ruled against him, and these are now assigned as error.

JAMES B. CLARKE and GEO. W. CRABB, for the plaintiff in error, made the following points:

1. If the law of North Carolina governs the property, it should be proved, if a statute, by a certified or sworn copy. [Story's Confl. L. 529, § 639, d; 2 Cranch, 236; 4 Gill & John. 1, 63; Greenl. Ev. § 487.] If there is no statute, then the *conclusive* presumption is, that the common law prevails there as here. [10 Wend. 75; 1 Mass. 103; 3 Stewart, 160.] And if the common law prevails there, no evidence was necessary, and the books of reports should have been rejected as irrelevant, as it is the duty of the court to administer the law precisely as if the facts had occurred in Alabama.

2. But if it was the proper course to prove what the unwritten law of North Carolina was, the books of reports was not the best evidence; it should have been proved by the

testimony of witnesses instructed in that law. [Story's Confl. L. § 642.]

3. .If the books of reports were proper evidence, the court should have construed and applied the law, instead of leaving that matter to the jury. [Story's Confl. L. § 628, in note; Greenl. Ev. § 486.]

4. It is insisted, that the *lex domicilii* of the grantor is not the law of the case, because the only question arising on the deed of gift is one of intention, and to be determined by a correct interpretation of the language; and also, because the deed was reaffirmed by the first taker, after his removal to this State in favor of the remainder man.

5. The evidence furnished of the *lex domicilii* does not establish any principle applicable to this case, inconsistent with the general common law, inasmuch as the cases reported in 2 Haywood, and 2 and 3 Devereaux, are not in point. Confining them to the facts of the respective cases, and the questions of law directly involved, which are alone determined, they neither establish, nor conduce to establish, that a vested remainder in slaves, may not be created by deed, to take effect after the determination of the first estate. [Cotton v. Hay, 2 Hayw. 139; Gilbert v. Murdock, 2 Ib. 18; Sutton v. Hollowell, 2 Dev. 185; Morris v. Williams, 3 Ib. 263.] On the contrary, it seems settled there, that such an estate may be created by deed. [2 Munf. 240; 1 Murf. 466; 1 Hayw. 234; 3 Murf. 493; Nichols v. Cartwright, 2 Ib. 173; 2 Bl. Com. 399; 2 Kent Com. 352.] It was then erroneous to read the books of reports as evidence of the law of North Carolina, as they do not establish the doctrine asserted by the plaintiff.

6. But if these cases do establish the doctrine, our courts are not bound by comity to follow erroneous views of the common law, when that law is common to both States. [Law Mag. Oct 1844, 32 to 53; Story's Confl. L. § 275; 5 Ala. Rep. 578.]

7. The doctrine of *estoppel* or *quasi estoppel* has no application here, adverse to the defendant. It was agreed expressly, that he did not know of the making of the trust deed; this should have prevented the plaintiff from insisting on the contrary before the jury. [2 Phil. Ev. 200, 209; Greenl. Ev.

§ 186, 197; Ib. p. 33, 216; 4 Peters, 83; 14 Mass. 437; 7 Pick. 169, 55; 10 Ib. 413; 16 John. 205; 6 Pick. 440; 13 Ib. 33; 2 Metc. 423.]

8. The near residence of the defendant to the grantor in the deed of trust, was entitled to no weight with the jury, even if proved; but there is nothing to warrant the conclusion that it was proved. Of the same nature is the possession of the defendant, and even his participation under the deed of trust as a beneficiary. Neither can be properly construed as an abandonment of his right to the slaves in controversy. Besides this, there is no evidence that he knew of the deed of trust, or received any benefit under it, until after the assertion of title to the slaves. The utmost effect of evidence of this nature is, to show a ratification, or confirmation of the act done, and here he had expressly disaffirmed it by taking the slaves.

9. The last charge is upon evidence which did not exist, is incorrect in mistaking that which was before the jury, and is also argumentative.

10. No inference of ratification can be drawn from the defendant's omission to take the slaves during the life of Dr. Inge, for then he had no title, and upon his death his executors were by statute authorized to keep the slaves until the last day of December following his death. [Clay's Digest, 196, § 19.]

W. M. MURPHY, contra, argued—

1. As Bullock, the original donor, resided in North Carolina, as well as all the other parties, and the property being also there, the law of that State governs the title; at least until its removal to Alabama. [Story's Confl. L. 314 to 316; 1 Peters' Dig. 582; 4 Bibb, 73.]

2. By the common law, no remainder in chattels, after the determination of a life estate was permitted. [2 Bl. Com. 389.] Though this rule has been altered in England, and some of the United States, it yet remains in full force in North Carolina, or was so when this deed was made. [1 Dev. 185; 3 Ib. 263; 2 Hayw. 130; Ib. 182.] Besides the evidence afforded by these decisions, a statute was passed in 1836-7, authorizing such a limitation, (1 Rev. Sta. 231, § 22,)

and this indicates that the law was as stated in the cases before cited.

3. The law of North Carolina is settled by the highest courts of that State, form a part of the unwritten law, and as such must determine what it is. [Gilder v. Prince, 3 Wash. C. C. 313; Daly v. Jones, 8 Wheat. 535; Jackson v. Chew, 12 Ib. 153.]

4. The books of reports were properly received in evidence to show what the common law of that State is. [3 Pick. 293; 13 Ib. 58; Dougherty v. Snyder, 15 S. & R. 87; 4 Dess. Eq. 26; 11 Conn. 407.]

5. Dr. Inge remained in possession of the slaves for more than three years after W. B. Inge came of age, and the deed showing his interest by way of limitation, was never recorded here, it is therefore void under our statute. [Clay's Dig. 255; 4 Bibb, 337.]

6. When Mr. Bullock made the deed of gift, the slaves had become the absolute property of Dr. Inge, as a marital gift. They were then given without qualification or limitation, and were kept by him for more than six years before the execution of the deed of gift, in 1819.

GOLDTHWAITE, J.—1. Previous to the consideration of the principal questions argued at the bar, it is as well to dispose of one which has been incidentally adverted to by the counsel for the plaintiff. It is, that as the slaves were in possession of Dr. Inge, after his marriage, and before the execution of the deed by Mr. Bullock, they must be considered as passing to the Dr. by virtue of his marriage, as a gift to his wife. The answer to this is, that no such presumption can possibly arise, as the doctor himself seems even to have conceded his title arose under the deed, and his acts and declarations effectually conclude his assignee from asserting a title independent of it.

2. With respect to the deed, if the title of Dr. Inge is derived under that, both parties concede the law of North Carolina must govern its exposition, it being the common source of title. We understand the defendant, however, to insist, the legal presumption is, the common law is in force there, and that it must be applied as understood in our own courts,

uninfluenced by alterations it may have undergone by reason of the decisions of the courts of that State. It is certainly true, the general presumption is, the common law prevails in those States of the Union of the same natural origin with our own—[Goodwin v. Griffin, 3 Stew. 160 ; Holmes v. Brough- ton, 10 Wend. 75 ; Walker v. Maxwell, 1 Mass. 103 ; Legg v. Legg, 8 Ib. 99 ;]—yet we cannot be supposed ignorant of the circumstance, that local usages and other causes, have in- troduced modifications, more or less important, in most of the States. If then, each State was to apply the common law, as understood in its own courts, to ascertain the rights of parties originating in other States, and of course to be in- terpreted by the law of that State, these rights, instead of be- ing uniform in all the States, would be as variant as are the modifications of the common law in each of the States. Hence arises the necessity for some common rule, to which all can refer ; and this is to be found only in the law as un- derstood in the State where the rights originate. This prin- ciple is recognized by all the elementary writers, nor do we understand any decided case cited by the defendant's coun- sel as controverting it. Those referred to merely held, that it rests with the party asserting the modification of the com- mon law, to show that matter by proof. To the same ex- tent is the decision of this court in Goodwin v. Griffin, be- fore cited. We shall assume then, without further discus- sion, that the rights of these parties, so far as derived through the deed of Mr. Bullock, must receive the same considera- tion here as they would have received in North Carolina, at the date of the conveyance.

3. Having ascertained that the law of North Carolina is to furnish the rule by which to measure the rights of these par- ties, as derived through the deed of Mr. Bullock, it becomes necessary to inquire how the court and jury was to be advis- ed of that law. We have already seen the *prima facie* pre- sumption is, that the common law prevails in that State, (it being of common natural origin with our own,) and this pre- sumption must prevail, unless a different rule is shown to ex- ist, either by some modification of that law peculiar to that State, or in consequence of some statute. The ordinary mode of proving the unwritten laws of a *foreign* county is,

by the testimony of witnesses instructed in that law. [Greenl. Ev. 480 ; Story's Confl. L. § 641, 642.] But this seems not to be the only means for obtaining the requisite information, and the ecclesiastical and admiralty courts of England sometimes act on the certificate of officers accredited by the government where laws are certified. In Re Dormey, 3 Hagg. 767 ; The Diana, 1 Dod. 95 ; see also, Talbot v. Seaman, 1 Cranch, 38. Both the authorities previously quoted refer also to the case of Rex v. Picton, 30 Howell's State Trials, as a decision on the same point, but whether this is a decision at common law, or in the admiralty, we have no means to ascertain. With respect to statutes of our sister States, many courts, as well as our own, hold these are proven *prima facie* by the production of the statute book, purporting to be published by authority of the State. [See cases cited Greel. Ev. 489.] If the statute laws of a sister State may be thus proved, we cannot perceive a sound reason why the common law, as modified by the decisions of the State courts, may not be proved by the production of the accredited reports of these decisions. We every day elucidate our own common law by referring to these reports, and it would seem a singular anomaly if they cannot be admitted as evidence to show to what extent the local decisions of a particular State, of which they are the accredited exponants, have modified the common law. For accuracy of information, such reports seem equal at least to the testimony of witnesses, which, however respectable the individuals may be, must chiefly, if not entirely, be founded on information derived from the same sources. In Dougherty v. Snyder, 15 S. & R. 85, it is said, by the supreme court of Pennsylvania, that unwritten laws may be proved as well by public history, and decided cases, as by witnesses. And in Raynham v. Canton, 3 Pick. 293, and McRae v. Matton, 13 Ib. 87, books of reports of a sister State are conceded to be proper evidence. We have looked at the other cases cited, but do not find them to bear on the point, except that in Lattimore v. Elgin, 4 Dess. 26, it seems the chancellor considered the law of Maryland was sufficiently established by a quotation in Haywood's North Carolina Reports ; nor have we been able to find any express adjudication in which the precise question is decided. But the reasons we have

previously stated, lead us to the conclusion that the common law, as modified in a sister State, by judicial decision, may be proved by the production of the reports of adjudged cases, accredited in the particular State.

4. But when the evidence of the law of N. Carolina was shown, was it to be submitted as a fact to the jury to decide, or to the court, that the judge might instruct the jury how far the rights of the parties were affected by it ? This is another, and not the least important question in this case. It seems to us almost a self-evident proposition, that laws, whether written or statute, domestic or foreign, must be ascertained, in the general, and always construed by the court; and equally so, that it is manifestly not the province of the jury to place the construction upon it, under any circumstances. If the rule was otherwise than stated, it would be hazardous in the extreme; for the court trying the cause would be ignorant whether the verdict was given because the facts were mistaken, or the law misconstrued, and there would be no means to correct an error, if the jury put an improper construction on the law. There is a strong analogy in this respect between written stipulations binding the parties and laws which are obligatory on them. In the former case the writing is said to be the law of the contract, &c., and in the latter it is so without any stipulation, and in this respect it matters not whether the writing is executed in one country or another, it is alike to be construed by the court, and not by the jury. The rule with reference to proof of the execution of a deed, is in the first instance to the court, and it is only in case of doubt or contest that the question of execution goes to the jury to decide. See cases collected in C. & H. Notes, 1310. We have met with but one case where it is said, the *construction* of a foreign law may be submitted to a jury, and there it seems rather a casual expression than a decided point. [Bracket v. Norton, 4 Conn. 638.] Mr. Justice Story states, the principle in relation to foreign laws in the broadest manner, and is fully sustained by the cases which he cites. [Story Confl. L. § 638.]

5. Having ascertained the principles upon which this case should be determined, so far as the admission of evidence of

the law of North Carolina, it is as well here as elsewhere, to declare the necessity that the cause should be sent to another trial, in order that the circuit court may give instructions to the jury upon that law, as it may then be ascertained. For ourselves, we must decline to examine the question of what the law is, or what is the legal effect of the decisions of the North Carolina courts, upon the rights of the parties, until these matters shall be first decided by the court of original jurisdiction. It is not improper, however, to remark, that as the *prima facie* presumption is, that the common law prevails in North Carolina, the evidence of its modification, or change, rests with the party asserting the change, and to establish it, the decisions of the courts must be looked to in the same manner as we would look to our own in the event that witnesses are examined, who rest their opinions on decided cases, and who may notwithstanding disagree in the conclusions to be drawn. It is scarcely necessary to say that the circuit court erred when the construction of the laws of North Carolina, to be drawn from the decisions before the jury, was left to them to decide.

6. There are however several other matters involved in this case, which require some further consideration. And first, with respect to the refusal of the court to charge on behalf of the defendant, that his silence when hearing that his father had conveyed the slaves sued for, and the participation by him in the trust funds raised under the deed, was no estoppel. Under the evidence disclosed, we think this whole matter was of no importance whatever, as bearing on the right of the defendant. Conceding he was aware of the execution of the trust deed, and its terms, he was not required in law to express any opinion upon it. Conceding his right to the remainder in the slaves, yet his father was entitled to the life estate, and that was a subject which he might legitimately convey. The question is not between a purchaser under the deed, and one claiming a remainder, who has stood by and seen the holder for life convey absolutely. Whatever the equities of such a purchaser might be, the plaintiff is not such a one. And as an objection from the defendant after the deed was executed could not affect its validity, no inference to aid the grantor can possibly be drawn from the o-

Inge v. Murphy.

mission of the defendant to dispute it before his title, if he has any, vested by the determination of the life estate.

7. The same remarks, in a great degree, apply to his acceptance of benefits under the deed. If he knew of its express terms, there is nothing in it to prevent his acceptance of monies arising out of the sales of other property, for the reason we have already stated, that Dr. Inge was entitled to convey his life estate, and the defendant was not bound to be active until that was determined. It follows then, that the court below should not have left this matter to the jury to draw their own conclusions, but they should have been instructed this circumstance could not affect the title of the defendant, if he had any.

8. Another point on which the court erred, was in leaving it to the jury to consider whether the defendant had not abandoned his interest in the property, by receiving a portion of it during the lifetime of Dr. Inge, or by assenting that he should convey it under the deed in evidence. What the effect of express assent to the conveyance would be, we are not called on to say, for none such is shown, but we can say, that such assent could not be legitimately presumed from the facts before the jury.

9. With the notice of another matter, we shall conclude this opinion. It is urged by the plaintiff, that the possession of the slaves by Dr. Inge, in this State, for more than three years, without the deed being recorded as provided by our statute of frauds, invests a purchaser from him with an indefeasible title. This point, whatever may be its merits, was not put before the jury by any request for instructions, nor was any charge given by the court. In this predicament of the suit it is equally improper to be decided, as is the question respecting the construction of the laws of North Carolina. When the entire case is again before the jury, it is probable all these questions will be again mooted, but we are not authorized to anticipate the decision.

Let the judgment be reversed and the cause remanded.