CHARLOTTE, (of color,) Respondent, v. CHOUTEAU, Appellant.

1. Judicial notice will not be taken of the laws of a foreign country.
2. If the foreign law is unwritten it may be proved by parol; it will not be presumed to be in writing.
3. Foreign written laws must be proved by the laws themselves properly authenticated.
4. It is the province of the court to instruct the judges as to the meaning and effect of the written foreign law adduced in evidence; and this construction should be the same which is given to it in the jurisdiction in which it is in force.
5. The opinions of text writers, the decisions of the courts, and the evidence of persons skilled in the foreign law, may be resorted to and consulted to enlighten the court in construing and expounding the foreign written law.
6. In a suit for freedom the onus of proving his right to freedom must rest upon the plaintiff; but the law does not couple the right to sue with ungenerous conditions; he may prove such facts as are pertinent to the issue, and may invoke such presumptions as the law raises from particular facts.

*Appeal from St. Louis Circuit Court.*

The facts sufficiently appear in the opinion of the court.

*Gantt,* for appellant.

I. The documentary evidence adduced by the defendant, consisting of the articles of capitulation, the treaty of peace, the act of 1771, the act of 1790 and the act of 1793 demonstrate the existence of negro slavery and its legality from 1763 until 1793.

II. The testimony of Messrs. Gale and Reed as to the effect of the acquisition of Canada by the British government was incompetent and illegal; also their testimony as to the effect

of various clauses in the treaty of cession, the king's procla-
mation, and the articles of capitulation.

III. There was no evidence whatever showing or tending
to show that Rose was unlawfully held as a slave in Canada
unless we regard as such the testimony of witnesses denying
the legality of slavery there after 1763 and before 1793.

IV. It is part of the case of the plaintiff that Rose was
held as a slave in Canada, and the testimony of the defendant
shows that she was rightfully so held; on this point there is
no opposing testimony whatever.

V. The verdict was flagrantly against law and the instruc-
tions of the court.

VI. The giving of the last instruction, at the instance of
the plaintiff, was calculated to mislead the jury, or rather to
encourage them to disregard every thing but their own sweet
will in making up their verdict. It is no instruction to them,
being the statement of a proposition too broad and abstract
to be of any real service in guiding them to the truth.

*A. J. P. Garesché* and *Cobb*, for respondent.

I. Foreign laws are to be proven as facts and submitted
under instructions to a jury. (Story's Confl. of Laws, § 1038,
1040; 1 Greenl. Ev. § 624–7; 1 Phill. on Ev. 401; 3 Watts
& Serg. 76; Consequa v. Willing, 1 Pet. C. C. 225; 15 Serg.
& Raw. 84; 9 Mo. 10; 3 Mo. 374.)

II. The instruction given to the court at the instance of
the plaintiff was correct. The verdict was not against the
evidence; and even if it were the Supreme Court would not
reverse for that reason. (Goetz v. Ambs, 22 Mo. 170; Hol-
liday v. Atterbury, 22 Mo. 512; Zimmerman v. Owens, 24
Mo. 97.)

RICHARDSON, Judge, delivered the opinion of the court.

The plaintiff asserts her right to freedom on the ground
that her mother, a negress, was born in Montreal, in Lower
Canada, about the year 1768, and that her mother was not

Charlotte v. Chouteau.

born a slave, because slavery did not exist in Canada at the time of her birth.

On the trial the plaintiff gave parol evidence tending to prove that her mother was born in Montreal about the year 1768, and that slavery did not actually exist and was not tolerated by law at that time in Canada.

The defendant, on his part, gave parol evidence tending to prove the actual existence of slavery in Canada in the year 1768; that slaves were recognized as property, and that Rose, the plaintiff's mother, was held and sold as a slave in Canada.

The defendant also gave the following documentary evidence:

*First.* The articles of capitulation of the surrender of Montreal by the French to the English forces, signed on the 8th September, 1760, by Lord Amherst, commander-in-chief of the British forces in North America, and the Marquis de Vaudreuel, governor and lieutenant general for the king of the French in Canada. The 27th article secured to the Canadians the free exercise of the Roman Catholic religion. The 47th article is as follows: " The negroes and panis of both sexes shall remain in their quality of slaves in the possession of the French and Canadians to whom they belong; they shall be at liberty to keep them in their service in the colony or to sell them; and they may also continue to bring them up in the Roman religion." " Granted, except those who shall have been made prisoners."

*Second.* The definitive treaty of peace concluded between the kings of Great Britain and France the 10th day of February, 1763, by which the French ceded and transferred to the crown of Great Britain Canada with all its dependencies. The king of Great Britain agreed to grant the liberty of the Catholic religion to the inhabitants of Canada, and that he would give the most effectual orders that his new Roman Catholic subjects might profess the worship of their religion according to the rites of the Romish church as far as the laws of Great Britain permitted; and that the French inhabitants, or others who had been the subjects of France in Cana-

da, might retire with all safety and freedom wherever they should think proper, and might sell their estates to British subjects, or take away their property without restraint. But the treaty is, in every respect, silent in reference to the persons or property of the Canadians.

*Third.* The proclamation of George III, dated 7th October, 1753. It begins by reciting that extensive and valuable acquisitions in America had been secured to the crown by the treaty concluded at Paris on the 10th of February, 1763, and being desirous that his subjects, as well of his kingdoms as of his colonies in America, might avail themselves of the great benefits which would accrue therefrom to their commerce, &c., he had thought fit to issue his proclamation, thereby to publish and declare to his subjects that he had granted letters patent to erect within the countries and islands ceded and confirmed by said treaty four distinct governments, called by the names of Quebec (Canada), East Florida, West Florida and Grenada. It then designates the extent and boundaries of said governments, and declares as follows: " And whereas it will greatly contribute to the speedy settling our said new governments, that our loving subjects should be informed of our paternal care for the security of the liberty and properties of those who are and shall become inhabitants, we have thought fit to publish and declare, by this our proclamation, that we have, in the letters patent, under our great seal of Great Britain, by which the said governments are constituted, given express power and directions to our governors of our said colonies respectively that, so soon as the state and circumstances of our said colonies will admit thereof, they shall, with the advice and consent of the members of our council, summon and call general assemblies within the said governments respectively, in such manner and form as is used and directed in those colonies and provinces in America which are under our immediate government; and we have also given power to the said governors, with the consent of our said councils and the representatives of the people so to be summoned as aforesaid, to

make, constitute and ordain laws, statutes and ordinances for the public peace, welfare and good government of our said colonies, and of the people and inhabitants thereof, as near as may be agreeable to the laws of England, and under such regulations and restrictions as are used in other colonies; and in the mean time, and until such assemblies can be called as aforesaid, all persons inhabiting or resorting to our said colonies may confide in our royal protection for the enjoyment of the benefits of the laws of our realm of England; for which purpose we have given power, under our great seal, to the governors of said colonies respectively to erect and constitute, with the advice of our said councils respectively, courts of judicature and public justice within our said colonies, for the hearing and determining of all causes as well criminal as civil, according to law and equity, and, as near as may be, agreeable to the laws of England." There is nothing else in the proclamation that relates to this subject.

*Fourth.* The act of the British parliament of 1774, (14 George III, chap. 83,) entitled "An act for making more effectual provision for the government of the province of Quebec in North America." (30 British Stat. at large, 549.) There is nothing in this act that bears on the subject but the two following sections: "Sec. 4. And whereas the provisions made by the said proclamation in respect to the civil government of said province of Quebec, and the powers and authorities given to the governor and other civil officers of the said province by the grants and commissions issued in consequence thereof, have been found upon experience to be inapplicable to the state and circumstances of the said province—the inhabitants whereof amounted at the conquest to above sixty-five thousand persons, professing the religion of the Church of Rome, and enjoying an established form of constitution and system of laws by which their persons and property had been protected, governed and ordered for a long series of years from the first establishment of the said province of Canada—be it therefore further enacted, by the authority aforesaid, that the said proclamation, so far as the same relates to

the said province of Quebec, and the commission under the authority whereof the government of the said province is at present administered, and all and every the ordinance and ordinances made by the governor and council of Quebec for time being relative to the civil government and administration of justice in the said province, and all commissions to judges and other officers thereof, be and the same are hereby revoked, annulled and made void from and after the first day of May, one thousand seven hundred and seventy-five. Sec. 8. And be it further enacted by the authority aforesaid, that all his majesty's Canadian subjects within the province of Quebec—the religious orders and communities only excepted—may also hold and enjoy their property and possessions, together with all customs and usages relative thereto, and all other civil rights in as large, ample and beneficial manner as if the said proclamation, commissions, ordinances and other acts and instruments had not been made, and as may consist with their allegiance to his majesty and subjection to the crown and parliament of Great Britain; and that in all matters of controversy relative to property and civil rights resort shall be had to the laws of Canada as the rule for the decision of the same, and all causes that shall hereafter be instituted in any of the courts of justice to be appointed within and for the said province by his majesty, his heirs and successors shall, with respect to such property and rights, be determined agreeably to the said laws and customs of Canada, until they shall be varied or altered by any ordinance that shall from time to time be passed in said province," &c.

*Fifth.* The act of the British parliament of 1790, (Geo. III, chap. 27,) entitled " An act for encouraging new settlers in his majesty's plantations in America," (37 British Stat. at large, 24,) as follows: " Whereas it is expedient that encouragement should be given to persons who are disposed to come and settle in certain of his majesty's colonies and plantations in America and the West Indies, be it therefore enacted by the king's most excellent majesty, by and with the advice and consent of the lords, spiritual and temporal, and

Charlotte v. Chouteau.

commons in this present parliament assembled, and by the authority of the same, that from and after the first day of August, one thousand seven hundred and ninety, if any person or persons—being a subject or subjects of the territories or countries belonging to the United States of America—shall come from thence, together with his or their family or families, to any of the Bahama or Bermuda or Somers' Islands, or to any part of the province of Quebec, or of Nova Scotia, or any of the territories belonging to his majesty in North America, for the purpose of residing or settling there, it shall be lawful for any such person or persons, having first obtained a license for that purpose from the governor, or, in his absence, the lieutenant governor of said islands, colonies or provinces respectively, to import into the same, in British ships owned by his majesty's subjects and navigated according to law, any negroes, household furniture, utensils or husbandry and clothing free of duty; provided always, that such household furniture, utensils of husbandry and clothing shall not in the whole exceed the value of fifty pounds for every white person that shall belong to such family, and the value of forty shillings for every negro brought by such white person; and if any dispute shall arise as to the value of such household furniture, utensils of husbandry, or clothing, the same shall be heard and determined by the arbitration of three British merchants at the port where the same shall be imported—one of such British merchants to be appointed by the governor, or, in his absence, by the lieutenant governor of such island or province—one by the collector of the customs at such port— and one by the person so coming with his family. Sec. 2. And be it further enacted, that all sales or bargains for the sale of any negro, household furniture, utensils of husbandry, or clothing, so imported, which shall be made within twelve calendar months after the importation of the same (except in cases of the bankruptcy or death of the owner thereof) shall be null and void to all intents and purposes whatsoever." The third and last section relates only to the oath of allegiance required to be taken by the immigrant.

*Sixth.* The act of the princial parliament of Upper Canada, passed July 9th, 1793. (Rev. Stats. of Upper Canada, chap. 8, p. 18.) The first section of this act recites that it is highly expedient to abolish slavery in the province, so far as the same may gradually be done without violating private property. It then repeals so much of the act of 1790 as enables the governor or lieutenant governor to grant license for the importation of negroes, and forbids any negro or other person subjected to the condition of a slave from coming or bebing brought into the province after the passage of the act to be subject to the condition of a slave. The second section provides that nothing in the act should be construed to extend to liberate any negro subjected to service, or to discharge him from the possession of his owner, who should have come or been brought into the province in conformity to the conditions of the act of 1790, or should have otherwise come into the possession of any person by gift, bequest or purchase. The third section declares that in order to prevent the continuation of slavery within the province, every child thereafter born of a negro woman who was a slave, should remain with his or her master or mistress until such child should arrive at the age of twenty-five years, and then be free.

At the request of the defendant, the court gave the following instruction: " 1. If negro slavery existed by virtue of the laws and ordinances of the French government in Canada prior to the acquisition of that country by the English, and if the articles of capitulation, the treaty of cession, the acts of parliament of 1774 and 1790, and the king's proclamation of 1763, be correct copies of the genuine documents, then negro slavery was sanctioned and permitted by law in the country called the province of Quebec (which includes Montreal) at all times from the year 1760 to the year 1790." Other instructions were given to the jury, among which was the following, given at the plaintiff's instance: " Whether Rose was lawfully a slave in Cannda is a question for the jury to decide from the evidence on the trial."

These two instructions are incompatible, and both can not

stand. The first declared as a matter of law the legal effect of the documents named in it, and the court in giving it assumed that it was its duty, and not the province of the jury, to pass on their meaning and operation. The second submitted every proposition of law in the case to be determined by the jury. If it was a conclusion of law from the documents read in evidence, to be decided by the court, that slavery was sanctioned in Canada, it was not proper to refer the question whether or not it was *lawful* to the jury ; but if the last instruction was proper, though inconsistent with the first, the defendant can not complain ; and if the first was correct, the other was wrong, and was calculated to mislead the jury to the defendant's prejudice. The quality of these instructions must be determined by the question whether it is the duty of the court or the jury to construe a foreign law.

It is universally admitted that courts do not take judicial notice of the laws of a foreign country, but they must be proved as other facts in a trial. It will not be presumed that a foreign law is in writing, and if it does not appear that it is written, it may be proved by parol. (Livingston v. Maryland Ins. Co. 6 Cranch, 280.) But, like the proof of every other fact, the best evidence of which the cause is susceptible must be produced ; and as a witness may speak of the terms and nature of an unwritten contract, so he may testify of the existence of a foreign law ; but as, when the contents of a written instrument are sought to be proved, the instrument itself must be produced, so foreign written laws must be proved by the laws themselves. (2 Starkie's Ev. 331 ; Consequa v. Willing, Pet. C. C. 229 ; Robinson v. Clifford, 2 Wash. C. C. 1 ; United States v. Ortega, 4 Wash. C. C. 533 ; Dougherty v. Snyder, 15 Serg. & Raw. 87 ; Kinney v. Clarkson, 1 Johns. 394 ; Camparel v. Jernegan, 5 Blackf. 375 ; Gardner v. Lewis, 7 Gill, 379 ; McNeil v. Arnold, 17 Ark. 155.)

The English cases are contradictory. In Miller v. Hernwick, 4 Camp. 155, Gibbs, Ch. J., said : "Foreign laws not written are to be proved by the parol examination of wit-

nesses of competent skill.   But where they are in writing, a
copy properly authenticated must be produced ;" whilst Lord
Denman, in Baron De Bode's case (8 Q. B. 250) permitted a
witness to speak of the effect and state of the law in France
resulting from a decree, but Patterson, J., dissented.   In this
country the question is well settled, but the cases are not uni-
form on the point whether the evidence of the existence of a
foreign law is addressed in the first instance to the court or
to the jury.   In Consequa v. Willing it is said, that, whether
the law or usage is sufficiently proven or not, is a question of
fact for the jury, and so also in the case of the State v. Jack-
son, 2 Dev. 566, Ruffin, J., held that the " existence of a for-
eign law is a fact.   The court can not judicially know it, and
therefore it must be proved, and the proof, like all other, ne-
cessarily goes to the jury."   And in Moore v. Gwynn, 5
Ired. 190, where the question did not arise on statute, but
under the common law of Virginia, and the testimony was
conflicting, it was decided that it ought to be left to the jury.
But the decided weight of the American authorities goes to
the length of establishing the doctrine not only that it is the
province and duty of the court to instruct the jury as to the
meaning and effect of a foreign law, when proved, whether
the law is written or unwritten, but that the proof must be
made to the court.   Mr. Justice Story, in his Conflict of
Laws, (§ 638,) says :  " All matters of law are properly refer-
able to the court, and the object of the proof of foreign laws
is to enable the court to instruct the jury what, in point of
law, is the result of the foreign law to be applied to the mat-
ters in controversy before them.   The court are therefore to
decide what is the proper evidence of the laws of a foreign
country ; and when evidence is given of these laws the court
are to judge of their applicability, when proved, to the case
in hand."   And Mr. Greenleaf, in his treatise on evidence,
(1 Greenl. Ev. § 486,) quotes this section from Story, and
incorporates it into the text of his work as containing the
proper rule.   Gibson, Chief Justice, observed, in Sidwell v.
Evans, 1 Penn. 388, that " municipal law is a matter of

compact, and as such the construction of foreign statutes, as in the case of any other written compact, belongs to the court. A plausible distinction might be taken in this respect between written and the unwritten law which necessarily rests on parol, but it seems to have been disregarded."

Though the Supreme Court of North Carolina, in the case of the State v. Jackson, decided that a foreign law was to be proved as a fact to the jury, held, that when it is established " its meaning, its construction and effect is the province of the court. It is a matter of professional science; and as the terms of the law are taken to be ascertained by the jury, there is no necessity for imposing on them the burden of affixing a meaning on them more than on our own statutes." And in a late case (5 Ired.) the same court decided that, where the question arises under a statute, it is the province of the court to decide both as to the existence of the statute and its proper construction. The case in Inge v. Murphy, 10 Ala. 897, turned on the construction of a foreign statute, and the Judge, in delivering the opinion of the court, observed: " It seems to us a self-evident proposition that laws, whether written, statute, domestic or foreign, must be ascertained in the general and always construed by the court, and equally so that it is manifestly not the province of the jury to place the construction upon it under any circumstances." Again, in a very recent case in Pennsylvania (Bock v. Lauman, 24 State Rep. 447,) the doctrine was reasserted that, though the law of another state is a matter of fact, it is not necessary to be found by the jury but by the court, and that all the analogies of the law inclined the court to regard the interpretation of foreign laws, whether written or unwritten, as falling within the province of the court.

It may be doubted whether the rule ought to be applied or can be practically enforced when the foreign law offered in evidence is unwritten, or is the common law of the country where it prevails; for in many instances, as in the case in 5 Ired. 190, the evidence may be conflicting, and all the witnesses may state the law differently, in which case it would

be extremely difficult for the court to determine either the fact sought to be proved or to declare the legal effect of the evidence. And whilst it may be the better rule to submit as a question of fact the existence of a foreign law to the jury, we think that when it is written and received in evidence it is the duty of the court to construe it, and to instruct the jury as to its meaning and effect. We do not mean by the written law the statements of text writers or the decisions of courts; but these may be used with the evidence of experts to enlighten the court in expounding the foreign law; for when a foreign law has received a local construction, judicial decisions and law writers may be consulted, and professional witnesses may be examined for the purpose of ascertaining its meaning.

The first instruction, then, given by the court at the defendant's request, to the effect that negro slavery was sanctioned and permitted by law in the province of Quebec from 1760 to 1790 was proper, if the conclusion was legitimate from the facts stated in it; and it will therefore be necessary to recur to the evidence.

The plaintiff read the depositions of two learned and intelligent witnesses—Judges Reed and Gale—each of whom held high judicial positions for many years in Lower Canada. The former testified that slavery existed in Canada to a certain extent while under the dominion of the French, although he could find no law by which it was introduced prior to the year 1709, when, by an ordinance of the intendant of the colony, permission was given to the colonists to purchase negroes and panis from the Indians, because they would be useful in the cultivation of the soil; that this ordinance would seem to have been made in order to confirm a practice which had previously existed, though there was no law of the French government authorizing slavery in Canada; that it had been doubted whether the intendant or any governor of a particular colony could establish therein such a general principle of public law as slavery; but, he says, " it is certain, however, that from the time of this ordinance and before

slavery of negroes and panis, as therein stated, had been practiced and was still continued in the colony in 1736, as by an ordinance of Mr. Hoegnart, the then intendant, of the first of September of that year, a form for the emancipation of slaves was established and directed to be observed. So far the existence, if not the legality, of slavery would appear." He also states that the ordinance of 1736 assumed the legal existence of slavery. Judge Gale, the other witness, in speaking of the ordinance of 1709, says, it declared that it would be useful to the colony to hold negroes and Indians of a distant nation, called panis, as slaves, and therefore the negroes and panis, who had been or might be bought, should be held by the purchasers as their slaves; and that the ordinance of 1736 required masters who emancipated their slaves to do so only by written documents passed before public notaries, and declared other forms of emancipation void. In answer to the question whether slavery of negroes or other persons was recognized and allowed by law in Canada while the country belonged to France, he replied: " I believe that a modified system of slavery respecting negroes and some others was *de facto* exercised in Canada, in various instances, while the country remained under the French dominion; but I can not undertake to say that such *de facto* exercise of slavery was justifiable under sufficient legitimate enactment and a correct interpretation of the laws as they then stood." My opinion is to the contrary.

Both of these gentlemen prove that slavery existed in Canada from a period at least as early as 1709 to 1760; and though they say there was no act of the French legalizing it, we know that France permitted slavery in her West India colonies, and it can not be supposed that she was ignorant of the state of things in Canada for so long a time. And it may be assumed that slavery existed in Canada under the French rule, not only *de facto* but *de jure*. Slavery existed in nearly all of the North American colonies, though no law or royal decree has been found introducing it; but it was permitted, and afterwards sanctioned by laws concerning it, passed by

31—VOL. XXV.

colonial assemblies with the knowledge of the home governments.

The facts developed by the testimony of these witnesses in reference to the state of things in Canada before 1760, explain, if explanation was necessary, the purpose of the 47th article of the capitulation. It will be observed, by an examination of the articles of capitulation, that they make very few provisions affecting the inhabitants of Canada; and it is hardly probable that a besieged army, in the face of an enemy's guns, would stipulate in a separate article for the protection of an interest that had no real existence. No other allusion is made to the property of the inhabitants who intended to remain in the colony; and the 47th article is not only a clear recognition of the existence of slavery, but of the value of the interests connected with it. Only the most prominent objects seem to have engaged the attention of the retiring governor; for he secures nothing for his master's subjects but their religion and their slaves.

The national religion of England was protestant, and the French king was therefore jealous of the religion of his Canadian subjects; and the reason is obvious why the treaty of 1763 secured to the Canadians the enjoyment of the Roman Catholic religion, and did not stipulate for any other rights of conscience or property. No argument can be drawn from the silence of the treaty on the subject of slavery or any other peculiar institution; for the inhabitants of Canada, without any special guaranties, were entitled to all their rights of property, after the change of government, which they possessed under their former sovereign. The cession of a territory only passes the sovereignty, and does not interfere with private property. This is an established rule of public law, and is acknowledged and respected by all civilized nations. The subjects or citizens of a conquered or ceded country retain all rights of property which are not taken away by the new sovereign, and remain under their former laws until they are changed. (Strother v. Lucas, 12 Pet. 438; Mitchell v. United States, 9 Pet. 734; Blacks. Com. 107.) In the

United States v. Percheman, 7 Pet. 87, Chief Justice Marshall, in speaking of the rights to property acquired in Florida before its cession to the United States, remarks: "The people change their allegiance; their relations to their ancient sovereign is dissolved; but their relations to each other and their rights of property remain undisturbed. If this be the modern rule in case of conquest, who can doubt its application to the case of an amicable cession of territory? Had Florida changed its sovereign by an act containing no stipulations respecting the property of individuals, the rights of property in all those who became subjects or citizens of the new government would have been unaffected by the change." This principle was recognized in England in reference to Jamaica as early as 1693, in Blankard v. Galdy, 4 Mod. 222; also by Lord Mansfield, in Rex v. Vaughan, 4 Burr. 2500. Slavery now exists in Louisiana, Missouri and Florida without any act of legislation introducing it, and none was necessary; for, being in existence under the implied sanction at least of France and Spain in 1803 and 1819, it was continued, and was not dependent on any positive law for its recognition.

It is insisted that the royal proclamation of October 7, 1763, had the effect of abolishing slavery in Canada. Admitting that the king's prerogative included the power of making laws for the English colonies, we have searched through every clause of the proclamation to find a word or sentence which, in terms or by implication, remotely touches the subject. We have been directed to the clause of the proclamation set out in the first part of this opinion; but, on looking at it, it will be seen that no new law is decreed, but only the assurance is given that, until provincial assemblies can be called, all persons inhabiting or resorting to the colonies of Quebec, East Florida, West Florida and Grenada, may confide in the royal protection for the enjoyment of the benefit of the laws of England, and that orders had been given to the governors of said colonies respectively to erect courts of justice for the hearing and determining of all caus-

es, as well criminal as civil, as near as may be agreeable to the laws of England. The judges whose testimony we have noticed say that this proclamation introduced into all the colonies mentioned in it the common law of England, and that the genius and spirit of the common law are so hostile to slavery that wherever it is introduced or prevails it operates *ipso facto* to abolish slavery.

In 1763 the English acquired—besides Canada—Florida, Dominico, Saint Vincent and Tobago, in all which slavery existed; and though the proclamation expressly applied to all, it is well known, and these gentlemen admit, that it did not have the effect of abolishing slavery in Florida and the Grenadas. It is strange that it was potential for the purpose imputed to it in one place and not in the others. The Supreme Court of Louisiana remarked, in Seville v. Chretien, 5 Mart. 285, that they have not been able to find any trace of a legislative act of the European powers for the introduction of slavery into their American dominions. Yet it is an undisputed historical fact that slavery existed in nearly all the English colonies, now included in the United States, and that in each of them the " common law" was claimed as their birth-right, and causes in their courts were determined agreeably to the laws of England. If the opinion of the Canadian judges is correct, it is evident that the common law was not uniform in its operation, for it did not perform the work, in the thirteen colonies, ascribed to it in Canada. The common law of England was introduced in Missouri by an act of the territorial legislature of the 19th of January, 1816, and nobody ever supposed that it was equivalent to an act of emancipation.

In the case of the Attorney General v. Stewart, 2 Mer. 156, the question arose whether the proclamation we have been considering extended the laws of England to Grenada, and it was certainly doubted in that case whether they were carried by force of the proclamation to the province of Quebec. The Master of the Rolls, Sir William Grant, observes: " It seems to be supposed that this was done by the proclamation of

1763, which is set forth in the report. With regard to three of the four governments to which this proclamation related—East Florida, West Florida and Grenada—I am not aware that any controversy as to the effect of it ever arose. Perhaps there may have been, with respect to them, other acts and instruments more directly expressive of his majesty's intention to introduce the laws of England. But as to the fourth — the government of Quebec — which was included in the same proclamation, and where it must have had the same legal effect as in the others, it became a matter of great and long-continued discussion whether the laws of England had thereby been generally introduced in abrogation of the ancient municipal laws of country. In a report made by the Attorney and Solicitor General in 1766, little other effect was ascribed to this proclamation than of extending to the inhabitants of Canada the benefit of the criminal law of England." But no matter whether or not the proclamation introduced the laws of England into Canada, or whether they produced any change as to the rights of property, it is certain that the act of parliament of 1774 repealed so much of the proclamation as related to the laws of England, and enacted that the Canadians within the province of Quebec might " hold and enjoy their property and possessions, together with all customs and usages relative thereto, and all other their civil rights, in as large, ample and beneficial manner as if the said proclamation" had not been made, " and that in all matters of controversy relative to property and civil rights" resort " should be had to the laws of Canada as the rule for the decision of the same."

The act of 1790 is only consistent with itself on the idea that it assumed the existence of slavery in Canada. The mention of negroes is only in connection with other property which is exempted from the payment of an import duty ; and the prohibition on the sale of negroes or furniture, imported under the act within twelve months, was to prevent frauds on the revenue, and it implied that sales of negroes were lawful after the expiration of a year from the time they were

imported. It is said that this act was for the benefit of British subjects whose homes were uncomfortable to them in the United States after our independence was achieved. This is doubtless true, but it is hardly probable that out of tenderness to them Parliament would have established in Canada, for their benefit alone, a system of slavery which had never before existed there, and which it is alleged is so repugnant to the genius of the common law.

The province of Quebec was divided into the provinces of Upper and Lower Canada by an order in council August 24, 1791, which took effect 26th December following. The act of 1793, passed by the parliament of Upper Canada, not only repealed the immigration act of 1799, but provided for the prospective and gradual emancipation of the slaves born thereafter. It assumed that there were other slaves in the province than such as had been imported under the license granted by the act of 1790; for the second section provided that the act should not apply to slaves then in being, who had been brought in under the act of 1790, or to such as had otherwise come to the possession of any person by gift, bequest, or purchase. And if there were no other slaves than such as had been imported under the act of 1790, there was no reason for mentioning them.

It is true that this law was the act of Upper Canada, which does not include Montreal; but it was passed very soon after the province of Quebec was divided, and if slaves were lawfully held in the upper part of the province before the division, it must be supposed that the law which permitted it operated uniformly throughout the whole province. The parliament of Upper Canada, at its first session in 1792, introduced the English law, quite as effectually as the king's proclamation could have done it, as the rule of decision in all matters of controversy relative to property and civil rights; and it could not have thought that the common law was effectual to abolish slavery, otherwise there would have been no necessity for the subsequent act of 1793.

If a controversy should arise in our courts as to whether

Charlotte v. Chouteau.

slavery was authorized by law in Kentucky or Virginia, it is probable that no legislative act could be found in either state which, in express terms, legalized it; but the conclusion would force itself on the mind of a judge, and he would feel himself compelled to decide, that it was lawful, as a necessary inference from disconnected acts regulating the subject; and, in our opinion, if slavery existed in Canada under the French government, before the English acquired the country, it continued to exist and was lawful until it was abolished; and after a careful examination of the documentary evidence in this cause, and for the reasons which are here hurriedly given, we have arrived at the conclusion which the circuit court announced in the first instruction given for the defendant. The last instruction for the plaintiff is inconsistent with the first for the defendant, and was therefore improperly given. If the word " lawfully" had been omitted in the last instruction, it would have been unobjectionable; for though slavery was sanctioned by law in Canada, if in fact Rose was not a slave there, her children would not now be.

By omitting to notice the other instructions given for the defendant, our silence is not to be construed into an approval of them. The third instruction is very objectionable, for it implies that the plaintiff must make out her case by a higher degree of evidence, and that she must connect every link with more conclusive proof than is ever required in civil cases of other persons. If a negro sues for his freedom he must make out his case by proof like any other plaintiff, but the law does not couple the right to sue with ungenerous conditions; and he may prove such facts as are pertinent to the issue, and may invoke such presumptions as the law raises from particular facts. Our statute provides that in suits for freedom, " if the plaintiff be a negro or mulatto, he is required to prove his right to freedom;" (R. C. 1845, p. 533;) but this is not a common law rule of evidence, and, with this exception, we are not aware of any other rule peculiarly applicable to such suits. Judge Napton concurring, the judgment will be reversed, and the cause remanded.

Scott, Judge, dissenting. What may be the province of the court in the interpretation of foreign laws for the benefit of the jury I do not deem it necessary to determine, as I conceive no such question is involved in this record. The question for the jury was, whether slavery existed in Canada. No statute was produced creating or establishing that institution which called for the interpretation of the court. From the fact that there were laws and documents, in which reference was made to slaves, or which contemplated a state of slavery, it was to be inferred that slavery lawfully existed in Canada. That inference was one of fact to be made by the jury. As the jury have found the fact, whose exclusive province it was to do so, the practice of this court, now established for a number of years, forbids that a judgment should be reversed because a verdict is against the weight of evidence.